**KOPELOWITZ OSTROW P.A.**
Kristen Lake Cardoso (SBN 338762)
cardoso@kolawyers.com
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100

*Attorneys for Plaintiffs and the Class*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CARL SAPUTO JR., VALERIE TORRES, and JOYCETTE GOODWIN individually and on behalf of all others similarly situated,

|                          |
|--------------------------|
| Plaintiffs,              |

v.

JOHNSON & JOHNSON and KENVUE INC.,

Defendants.

Case No. **'24CV1117 JLS  KSC**

**PLAINTIFFS' CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Carl Saputo Jr., Valerie Torres, and Joycette Goodwin (together, "Plaintiffs") bring this Class Action Complaint against Defendants Johnson & Johnson ("J&J") and Kenvue Inc. ("Kenvue") (together, "Defendants"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## NATURE OF THE ACTION

1.  Plaintiffs bring this important consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendants' Band-Aid products, including Band-Aid Flexible Fabric Bandages, Band-Aid OURTONE Flexible Fabric BR45 Bandages; Band-Aid OURTONE Flexible Fabric BR55 Bandages; and Band-Aid OURTONE Flexible Fabric BR65 Bandages ("Products").

2.  Defendants formulate, manufacture, market, and sell the Products, which they uniformly represent and advertise as, *inter alia*, being the "#1 Doctor Recommended Brand" of bandages."[1]

3.  Defendants fail to disclose to consumers that the Products contain per- and polyfluoralkyl substances ("PFAS").

4.  PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been

---

[1] https://www.band-aid.com/products/adhesive-bandages/flexible-fabric-bandages.

CLASS ACTION COMPLAINT

associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[2]

5.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health. Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

6.      Defendants know the importance of marketing and labeling, including the value of the label representations they carefully choose for placement on the Products. Insofar as *PFAS* made its way into Defendants' Products on purpose, it should have been listed on the Product's labeling. Insofar as it made its way into the Products by accident, it follows that it was due to poor manufacturing processes by either Defendants and/or their agents.

7.      Defendants fail to mention the presence of PFAS in the Products on the label, and further consistently and pervasively market the Products as the "#1 Doctor Recommended [bandage] Brand," thus implying the Products are safe and fit for their intended use.

8.      Indeed, the Products actually contain PFAS—a category of man-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns.

9.      As a result of Defendants' misrepresentations and omissions, Plaintiffs and putative Class Members have suffered injury in fact, including economic damages.

10.      Accordingly, Plaintiffs bring their claims against Defendants individually and on behalf of a Class of all others similarly situated for (1) violation

---

[2] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," Environ. Sci. Technol. 2022, 56, 1162-1173, 1162.
[3] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-healthrisks-underestimated/.

CLASS ACTION COMPLAINT

of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"); (2) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.* ("FAL"); (3) breach of implied warranty under the Song-Beverly Act, Cal. Civ. Code § 1700, *et seq.* and Cal. Com. Code § 2314; (4) breach of express warranty; (5) negligent misrepresentation; and (6) unjust enrichment.

## PARTIES

### A. Plaintiffs

11.    Plaintiff Saputo is a resident of Barstow, California, and was, at all times relevant hereto, a citizen of California.

12.    Plaintiff Torres is a resident of Los Angeles, California, and was, at all times relevant hereto, a citizen of California.

13.    Plaintiff Goodwin is a resident of Gardena, California, and was, at all times relevant hereto, a citizen of California.

### B. Defendants

14.    J&J is a New Jersey corporation with its principal place of business located in New Brunswick, New Jersey.

15.    Kenvue is a Delaware corporation with its principal place of business located in Skillman, New Jersey.

## JURISDCTION AND VENUE

16.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiffs and Defendants are citizens of different states.

17.    This Court has personal jurisdiction over the Defendants because they transact business in this state and district, have substantial aggregate contacts with this state and district, engaged in conduct that has and had a direct, substantial,

reasonably foreseeable, and intended effect of causing injury to persons in this state and district, and because they purposefully availed themselves of the laws of the state of California, and further, because Plaintiffs purchased the Products in this state and district.

18.    In accordance with 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this district, including Plaintiffs' purchase of the Products, because Defendants transact substantial business in this district, and because Defendants have intentionally availed themselves of the laws and markets within this district.

## **FACTUAL ALLEGATIONS**

### *Defendants' Business*

19.    J&J is an American multinational, pharmaceutical, and medical technologies corporation.[4] It was founded in 1886 and is now one of the world's most valuable companies.[5]

20.    In 2023, J&J split off its consumer healthcare business sector into a newly publicly traded company, Kenvue.[6]

21.    Kenvue is an American consumer health company, formally known as the Consumer Healthcare division of Johnson & Johnson.[7] It is the proprietor of several well-known brands, including Bank Aid.[8] It boasts 135+ years of experience across its brands and serves over 1.2 billion consumers around the world.[9]

22.    J&J has manufactured, marketed, and sold the Products throughout the county, including in California, for over 100 years.

23.    According to Band-Aid's website,

---

[4] https://en.wikipedia.org/wiki/Johnson_%26_Johnson.
[5] *Id.*
[6] *Id.*
[7] https://en.wikipedia.org/wiki/Kenvue#cite_note-ap_2021-11-12-2.
[8] *Id.*
[9] https://www.kenvue.com/our-story.

CLASS ACTION COMPLAINT

> Our products have been used by millions—even billions—of people for more than a century, giving BAND-AID® Brand an iconic place in American culture. We reached that place through a history of innovation, healing, and caring for our customers.[10]

24.    Indeed, American consumers have grown to know and trust Band-Aid based on marketing campaigns such as "[t]he catchy commercial jingle, 'I am stuck on BAND-AID® Brand cuz BAND-AID's stuck on me,'" and representations by Defendants in commercials and on packaging that the Products are the "#1 Doctor Recommended Brand."

25.    Defendants sell their products, including the Products that are the subject of this litigation, at mass market retailers, grocery stores, and drugstores throughout the United States, including California.

***PFAS Chemicals and Associated Risks***

26.    PFAS are a category of highly persistent and potentially harmful man-made chemicals.[11]

27.    PFAS are not naturally occurring.[12] They were first developed by scientists in the 1940s.[13]

28.    The man-made PFAS chemicals, which are in the Products, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

29.    PFAS chemicals have been associated with a variety of negative health effects for humans and the environment.

30.    The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:"[14]

a.    Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

---

[10] https://www.band-aid.com/our-brand/brand-history.
[11] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained.
[12] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html.
[13] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/.
[14] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas.

CLASS ACTION COMPLAINT

b.  Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

c.  Increased risk of some cancers, including prostate, kidney, and testicular cancers.

d.  Reduced ability of the body's immune system to fight infections, including   reduced vaccine response.

e.  Interference with the body's natural hormones.

f.  Increased cholesterol levels and/or risk of obesity.

31.  A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[15]



---

[15] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.

- 6 -

CLASS ACTION COMPLAINT

32.    The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[16]

33.    The danger of PFAS chemicals is well known. On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies", reported on the dangers of PFAS—particularly during gestation and in early childhood development:[17]

34.    As a result, the state of California has enacted laws that prohibit or require notification for the commercial distribution of products containing PFAS.

35.    Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.[18]

36.    According to the Environmental Protection Agency ("EPA"), limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[19]

37.    There is no treatment to remove PFAS from the body. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[20]

---

[16] *Id.*

[17] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW YORK TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

[18] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html

[19] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk.

[20] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure.

CLASS ACTION COMPLAINT

38.     Defendants are well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why they have engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Products are safe by representing they provide trusted protection for healing wounds and are recommended by doctors across the country.

39.     Reasonable consumers purchasing the Products would believe, based on Defendants' representations, that the Products are safe to use and do not contain chemicals that could adversely impact their health.

***Discovery of PFAS in the Products***

40.     "Mamavation is a green parenting community, website, and blogger network" that provides guidance on non-toxic products, health research, organic food, and clean indoor air quality.[21] It uses EPA-certified labs to identify chemicals, and then translates the science behind the findings using a scientific and medical advisory team.[22] Mamavation's consumer studies are funded by affiliate proceeds and sales from the site.[23]

41.     On or about April 2, 2024, Mamavision published a " 'Band-Aids' & Bandages with Indications of PFAS 'Forever Chemicals' Report" ("Band-Aid PFAS Report").[24]

42.     According to the Band-Aid PFAS Report, Mamavation sent 40 bandages from 18 brands, including the Products, to an EPA-certified laboratory looking for indications of PFAS.[25]

---

[21] https://www.mamavation.com/about-network#:~:text=Mamavation%20is%20a%20green%20parenting,brand%20introductions%20and%20product%20recommendations; *see also* https://www.mamavation.com/.
[22] https://www.mamavation.com/product-investigations#:~:text=We%20use%20several%20EPA%2DCertified,and%20from%20%20Environmental%20Health%20News.
[23] *Id.*
[24] https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html.
[25] *Id.*

43.     Mamavation's EPA-certified laboratory used marker testing to identify the potential presence of PFAS "forever chemicals" in bandages.[26]

44.     Organic fluorine is a marker for PFAS because all PFAS chemicals are carbon-based compounds that contain fluorine. The specific lab method used to test for total fluorine was the "Determination of Total Fluorine by Oxygen Flask Combustion and Ion-Selective Electrode." If total fluorine was observed at a detection level of 10 ppm or greater, the lab did the "Determination of free Fluoride Ion in the product by Ion-Selective Electrode" and then subtracted that from the Total Fluorine to determine the amount of organic fluorine. This marker testing is likely to show the presence of PFAS. Organic fluorine can also capture other fluoropolymers, pharmaceuticals, and common hydrofluorocarbon refrigerants, such as 1,1,1,2-tetrafluoroethane (commonly known as R-134a) and 2,3,3,3-tetrafluoropropene (commonly known as HFO-1234yf), which are all also PFAS.[27]

45.     Scott Belcher, Ph.D. & Associate Professor with the Center for Environmental & Health Effects of PFAS at North Carolina State University says "fluoropolymers, such as polytetrafluoroethylene (PTFE), are extremely common forms of PFAS that could be contributing to the organic fluorine found in bandages. Methods used for detecting individual PFAS, such as PFOA or GenX, cannot directly identify PTFE. However, the analysis of total organic fluorine (TOF) does account for all PFAS contaminants in bandages, including PTFE. Therefore, this method of testing serves as a good 'spot-check' of consumer products."[28]

46.     The Band-Aid PFAS Report states that Mamavation's laboratory detected organic fluorine above 100 ppm in the absorbent pad or the adhesive flaps of the Products. Specifically, it found:

---

[26] *Id.*
[27] *Id.*
[28] *Id.*

CLASS ACTION COMPLAINT

a. Band-Aid Flexible Fabric Comfortable Protection Bandages[29] — 188 ppm organic fluorine on the absorbent pad;

b. Band-Aid OURTONE Flexible Fabric BR45 Bandages — 262 ppm organic fluorine on the absorbent pad;

c. Band-Aid OURTONE Flexible Fabric BR55 Bandages — 250 ppm organic fluorine on the absorbent pad; and

d. Band-Aid OURTONE Flexible Fabric BR65 Bandages — 260 ppm organic fluorine on the absorbent pads and 374 ppm on the sticky flaps. A second product tested had 169 ppm on the absorbent pad.[30]

47. Linda Birnbaum, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences and National Toxicology Program & Scholar in Residence at Duke University, and Adjunct Professor at both University of North Carolina, & Yale University had this to say: "Because bandages are placed upon open wounds, it's troubling to learn that they may be also exposing children and adults to PFAS. It's obvious from the data that PFAS are not needed for wound care, so it's important that the industry remove their presence to protect the public from PFAS and opt instead for PFAS-free materials."[31]

48. In addition to the Band-Aid PFAS Report commissioned by Mamavation, Plaintiffs sought independent third-party testing to determine whether the Products contain PFAS chemicals.

49. Plaintiffs' independent testing was conducted in accordance with accepted industry standards for detecting the presence of PFAS.

50. Plaintiffs' testing detected material levels of PFAS in the Products, including significant levels of 3-(4-fluorophenyl)-3-methyl-3-propanoic acid ("FPePA"), Perfluorononanoic acid ("FHpPA"), Perfluoro-n-nonanoic acid

---

[29] Mamavation tested an older sample that was likely 7-8 years old and not available in stores anymore. *Id.*

[30] *Id.*

[31] *Id.*

CLASS ACTION COMPLAINT

("PFNA"), Perfluoro-n-undecanoic acid ("PFUdA"), and Perfluoro-n-decanoic acid ("PFDA").

### Defendants' False and Deceptive Claims

51.    The Products are bandages that are uniformly represented as the #1 doctor recommended brand.[32]

52.    Defendants also represent the Flexible Fabric Products "can help protect against dirt and germs that may cause infection" and provide "[t]rusted protection for healing your wounds." The packaging also portrays a heart with a bandage (presumably, a Band-Aid brand Product) on it:



---

[32] See, e.g., https://www.band-aid.com/products/adhesive-bandages/ourtone-adhesive-bandages.

CLASS ACTION COMPLAINT



53. The Products do not disclose the presence of PFAS—or any other synthetic chemical—in their ingredients.

54. It is undeniable that the Products are uniformly represented across all marketing channels, including the Product's packaging.

**_Defendants' Unlawful Conduct_**

55. At all times relevant to this action, Defendants knew, or at minimum should have known, that their Products contain PFAS.

56. To capitalize on increasing consumer demand for products free from toxic ingredients like PFAS, Defendants have knowingly and willfully deployed a concerted strategy to distinguish its Products from competing options on the market by representing the Products as the "#1 Doctor Recommended [bandage] Brand" that provides "[t]rusted protection for [consumers'] healing wounds."

57. Throughout the class period, Defendants have targeted health-conscious consumers by falsely and misleadingly representing the Products as trusted and safe for consumers' health and well-being. Consequently, reasonable

consumers believe the Products are free of chemicals known to harm human health.

58.     Defendants are well-aware that consumers are increasingly demanding products that support their health and well-being.

59.     At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices. One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[33]

60.     These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[34]

61.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[35]

62.     Therefore, current research demonstrates, and Defendants' marketing strategy supports, that the presence of harmful chemicals in products is material to reasonable consumers.

63.     Defendants' strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to Products that do not contain harmful ingredients, would inevitably be negatively impacted if it disclosed the presence of PFAS in their Products.

64.     Defendants had exclusive knowledge of the contents and ingredients of their Products, including whether they contained PFAS.

65.     Defendants also had exclusive knowledge of their ingredient suppliers,

[33] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wpconent/uploads/2017/07/What-Shoppers-Want.pdf.
[34] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-thegame-for-food-beverage-processors/.
[35] Made Safe, "What Shoppers Want," at 3.

- 13 -

from whom Defendants could have obtained information about the contents and ingredients of the Production, including whether they contained PFAS.

66. Defendants also knew the presence of PFAS posed a concern with regard to the safety of the Products.

67. Despite this knowledge, Defendants failed to disclose the presence of PFAS in the Products. Such an omission was material to consumers.

68. Consumers lack the expertise to ascertain the true ingredients in the Products prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendants to accurately and honestly advertise their Products' ingredients and not contradict those representations by using chemicals in their Products that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

69. Defendants' representations that the Products provide "trusted protection for [consumers'] healing wounds" and failure to disclose the presence of PFAS in the Products' as descried herein are false and misleading because the Products actually contain toxic ingredients like PFAS.

70. Defendants' representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiffs and Class members, regarding the presence of PFAS chemicals in their Products. Accordingly, these acts and practices by Defendants are deceptive.

71. Consumers reasonably relied on Defendants' false statements and misleading representations, and reasonably expected that Defendants' Products would conform with their representations and, as such, would not contain harmful PFAS chemicals.

72. Defendants' false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render their Products worthless or less valuable.

- 14 -

73.     If Defendants had disclosed to Plaintiffs and putative Class Members that their Products contained PFAS chemicals, Plaintiffs and putative Class Members would not have purchased Defendants' Products or they would have paid less for them.

74.     Plaintiffs and Class Members were among the intended recipients of Defendants' deceptive representations and omissions described herein.

75.     Defendants' representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

76.     The materiality of the representations described herein also establishes causation between Defendants' conduct and the injuries Plaintiffs and the Class Members sustained.

77.     Defendants are aware that consumers are concerned about the use of PFAS in their products, yet it has continued to market and advertise their Products as safe and trusted for consumers' health and well-being, focused representations in order to profit off of unsuspecting consumers, including Plaintiffs and Class Members.

78.     The presence of PFAS chemicals in Defendants' Products are entirely inconsistent with their uniform representations.

79.     PFAS are present in Defendants' Products in a quantity which any reasonable person would consider to be significant.

80.     Defendants' knowingly false and misleading representations have the intended result of convincing reasonable consumers that their Products are safe for their intended use of protecting healing wounds and therefore do not contain toxic ingredients like PFAS. No reasonable consumer would consider Defendants' Products as doctor recommended (and, thus, safe) and "[t]rusted protection for [consumers'] healing wounds" if they knew that the Products contained harmful

PFAS chemicals.

81.     Defendants' false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiffs and Class Members.

82.     In making the false, misleading, and deceptive representations, Defendants knew and intended consumers would pay a premium for the Products over comparable products that contain PFAS.

83.     Plaintiffs and Class Members paid money and paid a premium for the Products over comparable products that are made from or contain PFAS, expecting the same or better quality than the comparable products. Due to Defendants' misrepresentations, Plaintiffs did not obtain the full value of the Products.

84.     Plaintiffs and Class Members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products' harmful ingredients, i.e., that they contain PFAS. Thus, Plaintiffs and Class Members have suffered injury in fact and lost money or property as a result of Defendants' wrongful conduct.

85.     Defendants' widespread marketing campaign portraying the Products as safe and trusted as detailed herein, is misleading and deceptive to consumers because the Products are made with toxic ingredients. Plaintiffs bring this action on behalf of the proposed Classes to stop Defendants' misleading practices.

## **PLAINTIFFS' FACTUAL ALLEGATIONS**

### *Plaintiff Saputo*

86.     During the applicable statute of limitations period, including in or around April of 2023, Plaintiff Saputo purchased the Band-Aid Flexible Fabric Bandages from a Walmart located in Victorville, California. Plaintiff paid

approximately $3 for the Product. Plaintiff Saputo purchased the Band-Aid Flexible Fabric Bandage Product multiple times prior to April of 2023.

87.    Prior to purchase, Plaintiff Saputo read the Products' packaging and advertising, including the representations that they are the "#1 Doctor Recommended Brand" and provide "[t]rusted protection for your healing wounds."

88.    Plaintiff Saputo believed he was purchasing Products that were safe for use and free of harmful chemicals like PFAS, due not only to Defendants' representations, but also Defendants' failure to mention the presence of PFAS on the packaging. Plaintiff Saputo reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that he would not have purchased the Products, or would have paid less for them, if the true facts had been known.

89.    As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Saputo suffered and continues to suffer, economic injuries.

90.    Plaintiff Saputo continues to desire to purchase the Products from Defendants if he can rely on the Products to be safe and free from any toxic ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff Saputo is unable to determine if Defendants' Products are actually free of harmful chemicals like PFAS in the future. Plaintiff Saputo understands that the composition of the Products may change over time, but as long as Defendants may freely advertise the Products as safe when they actually contain material levels of PFAS, when presented with false or misleading information when shopping, he will be unable to make informed decisions about whether to purchase Defendants' Products and will be unable to evaluate the different prices between Defendants' Products and competitor's products, which *are* in fact free of PFAS.

CLASS ACTION COMPLAINT

91.     Plaintiff Saputo also seeks to include an injunction to require the implementation and funding of a blood serum testing program for Plaintiff Saputo and Class Members to test for the presence of PFAS in their blood serum; and the implementation and funding of a medical monitoring program for Plaintiff Saputo and Class Members sufficient to monitor their health to ensure they are adequately monitored for the harmful effects of PFAS in the human body.

***Plaintiff Torres***

93.     During the applicable statute of limitations period, including in or around February of 2024, Plaintiff Torres purchased Band-Aid OURTONE Flexible Fabric BR45 Bandages; Band-Aid OURTONE Flexible Fabric BR55 Bandages; and Band-Aid OURTONE Flexible Fabric BR65 Bandages from CVS near her home in Los Angeles, California. Plaintiff Torres paid approximately $5 for each of the Products at the time of her purchase.

94.     Prior to purchase, Plaintiff Torres read the Products' packaging and advertising, including the representations that they are the "#1 Doctor Recommended Brand" and provide "[t]rusted protection for your healing wounds."

95.     Plaintiff Torres believed she was purchasing Products that were safe for use and free of harmful chemicals like PFAS, due not only to Defendants' representations, but also Defendants' failure to mention the presence of PFAS on the packaging. Plaintiff Torres reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products, or would have paid less for them, if the true facts had been known.

96.     As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Torres suffered and continues to suffer, economic injuries.

97.     Plaintiff Torres continues to desire to purchase the Products from Defendants if she can rely on the Products to be safe and free from any toxic

ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff Torres is unable to determine if Defendants' Products are actually free of harmful chemicals like PFAS in the future. Plaintiff Torres understands that the composition of the Products may change over time, but as long as Defendants may freely advertise the Products as safe when they actually contain material levels of PFAS, when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendants' Products and will be unable to evaluate the different prices between Defendants' Products and competitor's products, which *are* in fact free of PFAS.

98.     Plaintiff Torres also seeks to include an injunction to require the implementation and funding of a blood serum testing program for Plaintiff Torres and Class Members to test for the presence of PFAS in their blood serum; and the implementation and funding of a medical monitoring program for Plaintiff Torres and Class Members sufficient to monitor their health to ensure they are adequately monitored for the harmful effects of PFAS in the human body.

***Plaintiff Goodwin***

101.     During the applicable statute of limitations period, including in or around January of 2024, Plaintiff Goodwin purchased the Band-Aid OURTONE Flexible Fabric BR55 Bandages and Band-Aid OURTONE Flexible Fabric BR65 Bandages from Target near her home in Gardena, California. Plaintiff Goodwin paid approximately $5 for each of the Products at the time of her purchase.

102.     Prior to purchase, Plaintiff Goodwin read the Products' packaging and advertising, including the representations that they are the "#1 Doctor Recommended Brand" and provide "[t]rusted protection for your healing wounds."

CLASS ACTION COMPLAINT

103.   Plaintiff Goodwin believed she was purchasing Products that were safe for use and free of harmful chemicals like PFAS, due not only to Defendants' representations, but also Defendants' failure to mention the presence of PFAS on the packaging. Plaintiff Goodwin reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products, or would have paid less for them, if the true facts had been known.

104.   As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Goodwin suffered and continues to suffer, economic injuries.

105.   Plaintiff Goodwin continues to desire to purchase the Products from Defendants if she can rely on the Products to be safe and free from any toxic ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff Goodwin is unable to determine if Defendants' Products are actually free of harmful chemicals like PFAS in the future. Plaintiff Goodwin understands that the composition of the Products may change over time, but as long as Defendants may freely advertise the Products as safe when they actually contain material levels of PFAS, when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendants' Products and will be unable to evaluate the different prices between Defendants' Products and competitor's products, which *are* in fact free of PFAS.

106.   Plaintiff Goodwin also seeks to include an injunction to require the implementation and funding of a blood serum testing program for Plaintiff Goodwin and Class Members to test for the presence of PFAS in their blood serum; and the implementation and funding of a medical monitoring program for Plaintiff Goodwin

CLASS ACTION COMPLAINT

and Class Members sufficient to monitor their health to ensure they are adequately monitored for the harmful effects of PFAS in the human body.

## INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM

107. Defendants' wrongful conduct harms the public-at-large.

108. PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

109. PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones, and increased cholesterol levels.

110. Because Defendants' deceptive advertising is ongoing and directed to the public, and because Defendants continue to sell their Products containing PFAS chemicals, the deception poses an ongoing risk to the public.

111. As such, a public injunction must be provided in order to enjoin Defendants' continued harm of consumers and the public-at-large.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

112. Defendants had actual knowledge that their Products contained PFAS chemicals that pose a risk of harm to human health.

113. Although Defendants were aware of the deception in their advertising, marketing, packaging, and sale of the Products given the inclusion of PFAS chemicals, they took no steps to disclose to Plaintiffs or Class Members that their Products contained PFAS chemicals.

114. Despite their knowledge, Defendants have negligently misrepresented the Products as having qualities and characteristics they do not, while concealing the fact that their Products contain PFAS chemicals.

115. Defendants made, and continue to make, affirmative false statements and misrepresentations to consumers, and continue to omit the fact that the Products contain PFAS, to promote sales of their Products.

116. Defendants misrepresented, concealed, and otherwise omitted material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the Products. Defendants' misrepresentations and omissions were knowing, and they intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Defendants' misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

117. The PFAS chemicals in the design and/or manufacture of Defendants' Products were not reasonably detectible to Plaintiffs and Class Members.

118. At all times, Defendants actively and intentionally misrepresented the qualities and characteristics of the Products, while concealing the existence of the PFAS chemicals and failing to inform Plaintiffs or Class Members of the existence of the PFAS chemicals in their Products. Accordingly, Plaintiffs' and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

119. Defendants' statements, words, and acts were made for the purpose of deceiving the public and suppressing the truth that the Products contained PFAS chemicals.

120. Defendants misrepresented the Products and concealed the PFAS chemicals for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

CLASS ACTION COMPLAINT

121. As a result of Defendants' intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiffs and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendants are estopped from relying on any statutes of limitations in light of their intentional misrepresentations and active concealment of the inclusion of PFAS chemicals in the Products.

122. Further, the causes of action alleged herein did not occur until Plaintiffs and Class Members discovered that the Products contained PFAS chemicals. Plaintiffs and Class Members had no realistic ability to discern that the Products contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiffs and Class Members were hampered in their ability to discover their causes of action because of Defendants' active concealment of the existence and true nature of the Products.

## FEDERAL RULE OF CIVIL POROCEDURE 9(B) ALLEGATIONS

123. Although Defendants are in the best position to know what content they placed on their packaging, website(s), and other marketing and advertising during the relevant timeframe, and the knowledge they had regarding the PFAS chemicals and their failure to disclose the existence of PFAS chemicals in the Products to Plaintiffs and consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

124. **WHO**: Defendants made their "[t]rusted protection for your healing wounds" and other representations on the Products' packaging, online, and their marketing and advertising of the Products.

125. **WHAT**: Defendants' conduct here was, and continues to be, deceptive and negligent because of their "#1 Doctor Recommended Brand," "[t]rusted protection for healing your wounds" and heart/bandage logo representations and

failure to disclose the Products contain PFAS, which, together, imply the products are safe for their intended use and do not contain harmful, toxic ingredients. Thus, Defendants' conduct deceived Plaintiffs and Class Members into believing that the Products were manufactured and sold with the represented qualities. Defendants knew or should have known this information is material to reasonable consumers, including Plaintiffs and Class Members, in making their purchasing decisions, yet it continued to pervasively market the Products as possessing qualities they do not have.

126. **WHEN**: Defendants made material misrepresentations, false statements, and/or material omissions during the putative Class periods and at the time Plaintiffs and Class Members purchased the Products, prior to and at the time Plaintiffs and Class Members made claims after realizing the Products contained harmful chemicals, and continuously throughout the applicable Class periods.

127. **WHERE**: Defendants' marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Products' packaging, as well as on website(s) and social media channels used to market and advertise the Products.

128. **HOW**: Defendants made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Products.

129. **WHY**: Defendants made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products over other brands that did not make similar representations, the effect of which was that Defendants profited by selling the Products to many thousands of consumers.

CLASS ACTION COMPLAINT

130.   **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent Defendants' misrepresentations and false and misleading statements.

<u>**CLASS ACTION ALLEGATIONS**</u>

131.   Plaintiffs bring this action individually and as the representative of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

> **National Class**: During the fullest period allowed by law, all persons who purchased the Products within the United States for personal use and not for resale.

> **California Subclass**: During the fullest period allowed by law, all persons who purchased the Products within the state of California for personal use and not for resale.

132.   Members of the classes described are referred to herein as "Class Members" or members of the "Class."

133.   Plaintiffs reserve the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

134.   The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

135.   **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiffs do not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Products nationally, the members of the Class are so numerous that their individual joinder herein is impracticable.  Plaintiffs are informed and believe there are hundreds of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

136.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

a.   Whether Defendants misrepresented, omitted, and/or failed to disclose material facts concerning the Products;

b.   Whether Defendants' conduct was unlawful; unfair; negligent and/or deceptive;

c.   Whether Defendants breached express warranties to Plaintiffs and Class Members;

d.   Whether Defendants were unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendants to retain the benefits conferred upon it by Plaintiffs and the proposed Class;

e.   Whether Plaintiffs and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

137.   Defendants engaged in a common course of conduct giving rise to the legal rights Plaintiffs seek to enforce on behalf of themselves and the other Members of the proposed Class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

138.   **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiffs' claims are typical of the claims of the other Members of the Class because, among other things, all Members of the Class were comparably injured through Defendants' uniform misconduct described herein. Further, there are no defenses available to Defendants that are unique to Plaintiffs or to any particular Members of the Class.

139.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Members of the Class they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and they will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and the undersigned counsel.

140.   **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

141.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendants' wrongful conduct. Even if Members of the Class could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Violations of the California Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, et seq.**
**(On Behalf of Plaintiffs and the California Class)**

142.   Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege paragraphs 1 through 141 as if fully included herein.

143.   Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17201.

144.   Plaintiffs and California Class Members who purchased Defendants' Product suffered an injury by virtue of buying products in which Defendants omitted the Product's true quality, reliability, safety, and use. Had Plaintiffs and California Class Members known that Defendants omitted material information regarding the Product, they would not have purchased the Product.

145.   Defendants' conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in this Complaint.

146.   There is no benefit to consumers or competition by allowing Defendants to deceptively label, market, and advertise its Product.

147.   Plaintiffs and California Class Members who purchased Defendants' Product had no way of reasonably knowing that the Product was deceptively packaged, marketed, advertised, and labeled, was not safe for human consumption, and was unsuitable for its intended use as a protective bandage for healing wounds. Thus, Plaintiffs and California Class Members could not have reasonably avoided the harm they suffered.

148.   Specifically, Defendants marketed, labeled, and represented the Product with the representations described herein, when in fact the Product contains PFAS, which no reasonable consumer would believe was in Product, which was represented as trusted, safe, and recommended by doctors.

149.   The gravity of the harm suffered by Plaintiffs and California Class Members who purchased Defendants' Product outweighs any legitimate justification, motive, or reason for packaging, marketing, advertising, and labeling the Product in a deceptive and misleading manner. Accordingly, Defendants' actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiffs and California Class Members.

150.   The above acts of Defendants in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiffs and California Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendants' Product and, thus, were violations of Cal. Bus. & Prof. Code §§ 17500, et seq.

CLASS ACTION COMPLAINT

151.   Defendants have violated the UCL's proscription against engaging in unlawful business practices as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

152.   Defendants have also violated the UCL's proscription against engaging in unfair business practices. Defendants' acts, omissions, and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 et seq. in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

153.   Defendants have further violated the UCL's proscription against engaging in fraudulent business practices. Defendants' claims, nondisclosures, and misleading statements with respect to the Product, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

154.   Plaintiffs and the other California Class Members suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Product.

155.   As a result of Defendants' above unlawful, unfair, and fraudulent acts and practices, Plaintiffs, on behalf of themselves and all others similarly situated, and as appropriate, on behalf of the general public, seek injunctive relief prohibiting Defendants from continuing these wrongful practices.

156.   Additionally, Plaintiffs seek restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the

entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and other California Class Members. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

**COUNT II**
**Violation of the California False Advertising Law ("FAL"),**
**California Business and Professions Code §§ 17500, et seq.**
**(On Behalf of Plaintiffs and the California Class)**

157.   Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege paragraphs 1 through 141 as if fully included herein.

158.   The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

159.   The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

160.   Defendants violated the FAL by failing to disclose the Product contained harmful PFAS, which is a material fact to reasonable consumers.

161.   At the time of its misrepresentations, Defendants were either aware the Product contained PFAS, which no reasonable consumer would expect would be in the Product, given it is not included anywhere in the Product's label, or was aware that it lacked the information and/or knowledge required to make such a representation truthfully. Defendants concealed, omitted, and failed to disclose this information to Plaintiffs and California Class Members.

CLASS ACTION COMPLAINT

162.   Defendants' descriptions of the Product were false, misleading, a material omission, and likely to deceive Plaintiffs and other reasonable consumers.

163.   Defendants' conduct therefore constitutes deceptive or misleading advertising.

164.   Plaintiffs have standing to pursue claims under the FAL, as they reviewed and relied on Defendants' packaging, advertising, representations, and marketing materials regarding the Product when selecting and purchasing the Product.

165.   In reliance on the statements made in Defendants' advertising and marketing materials and Defendants' omissions and concealment of material facts regarding the quality and use of the Product, Plaintiffs and California Class Members purchased the Product.

166.   Had Defendants disclosed the true nature of the Product (that it contains or risks containing PFAS), Plaintiffs and California Class Members would not have purchased the Product or would have paid substantially less for it.

167.   As a direct and proximate result of Defendants' actions, as set forth herein, Defendants have received ill-gotten gains and/or profits, including but not limited to money from Plaintiffs and California Class Members who paid for the Product, which contained harmful chemicals and was therefore safe.

168.   As a result of Defendants' above unlawful, unfair, and fraudulent acts and practices, Plaintiffs, on behalf of themselves and all others similarly situated, and as appropriate, on behalf of the general public, seek injunctive relief prohibiting Defendants from continuing these wrongful practices.

169.   Additionally, Plaintiffs seek restitution if monetary damages are not available. Indeed, restitution under the FAL can be awarded in situations where the entitlement to damages may prove difficult. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and

other Class Members. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. Thus, restitution would allow recovery even when normal consideration associated with damages would not.

## COUNT III

### Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, et seq. and California Commercial Code § 2314 (On Behalf of Plaintiffs and the California Class)

170.   Plaintiffs bring this count on behalf of themselves and the California Class and repeat and re-allege paragraphs 1 through 141 as if fully included herein.

171.   Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. et seq., and California Commercial Code § 2314, every sale of consumer goods in the state of California is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act. In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

172.   The Product at issue here is a "consumer good[]" within the meaning of Cal. Civ. Code § 1791(a).

173.   Plaintiffs and California Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

174.   Defendants are in the business of manufacturing and/or producing the Product and therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

175.   Defendants impliedly warranted to retail buyers that the Product was merchantable in that it would: (a) pass without objection in the trade or industry under the contract description, and (b) was fit for the ordinary purposes for which

the Product is used. For a consumer good to be "merchantable" under the Song-Beverly Act, it must satisfy both of these elements. Defendants breached these implied warranties because the Product was unsafe for consumption due to its inclusion of PFAS. Therefore, the Product would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

176. Plaintiffs and California Class Members purchased the Product in reliance upon Defendants' skill and judgment in properly packaging and labeling the Product.

177. The Product was not altered by Plaintiffs or California Class Members.

178. The Product was defective at the time of sale. The issue as described in this Complaint was latent in the Product and not discoverable at the time of sale.

179. Defendants knew the Product would be purchased and used without additional testing by Plaintiffs and California Class Members.

180. As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiffs and California Class Members have been injured and harmed because they would not have purchased the Product if they knew the truth about the Product, namely, that it was unfit for use and posed a significant safety risk.

181. Plaintiffs have not sent a notice letter to Defendants regarding their Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. et seq. Plaintiff will do so and amend this Complaint to seek all relief available to Plaintiffs under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. et seq.

182. Plaintiffs and the California Class seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT IV
### Breach of Express Warranty
### (On Behalf of Plaintiffs and the National Class)

183. Plaintiffs bring this count on behalf of themselves and the National Class and repeat and re-allege paragraphs 1 through 141 as if fully included herein.

184.   Plaintiffs and Class Members formed a contract with Defendants at the time Plaintiffs and Class Members purchased the Products.

185.   The terms of the contract include the promises and affirmations of fact made by Defendants on the Products packaging and through marketing and advertising, as described above.

186.   This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and Class Members.

187.   As set forth above, Defendants purport through their advertising, labeling, marketing, and packaging, to create an express warranty that the Products are safe for use and provided "[t]rusted protection for [consumers'] healing wounds."

188.   The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

189.   These affirmations of fact became part of the basis for the bargain and were material to Plaintiffs' and Class Members' decision to purchase the Products.

190.   Plaintiffs and Class Members reasonably relied upon Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Products.

191.   Plaintiffs and Class Members performed all conditions precedent to Defendants' liability under this contract when they purchased the Products.

192.   Defendants thereby breached the following state warranty laws:

      a.      Code of Ala. § 7-2-313;

      b.      Alaska Stat. § 45.02.313;

      c.      A.R.S. § 47-2313;

      d.      A.C.A. § 4-2-313;

e.    Cal. Comm. Code § 2313;

f.    Colo. Rev. Stat. § 4-2-313;

g.    Conn. Gen. Stat. § 42a-2-313;

h.    6 Del. C. § 2-313;

i.    D.C. Code § 28:2-313;

j.    Fla. Stat. § 672.313;

k.    O.C.G.A. § 11-2-313;

l.    H.R.S. § 490:2-313;

m.    Idaho Code § 28-2-313;

n.    810 I.L.C.S. 5/2-313;

o.    Ind. Code § 26-1-2-313;

p.    Iowa Code § 554.2313;

q.    K.S.A. § 84-2-313;

r.    K.R.S. § 355.2-313;

s.    11 M.R.S. § 2-313;

t.    Md. Commercial Law Code Ann. § 2-313;

u.    106 Mass. Gen. Laws Ann. § 2-313;

v.    M.C.L.S. § 440.2313;

w.    Minn. Stat. § 336.2-313;

x.    Miss. Code Ann. § 75-2-313;

y.    R.S. Mo. § 400.2-313;

z.    Mont. Code Anno. § 30-2-313;

aa.    Neb. Rev. Stat. § 2-313;

bb.    Nev. Rev. Stat. Ann. § 104.2313;

cc.    R.S.A. 382-A:2-313;

dd.    N.J. Stat. Ann. § 12A:2-313;

ee.    N.M. Stat. Ann. § 55-2-313;

- 36 -

ff.    N.Y. U.C.C. Law § 2-313;

gg.    N.C. Gen. Stat. § 25-2-313;

hh.    N.D. Cent. Code § 41-02-30;

ii.    II. O.R.C. Ann. § 1302.26;

jj.    12A Okl. St. § 2-313;

kk.    Or. Rev. Stat. § 72-3130;

ll.    13 Pa. Rev. Stat. § 72-3130;

mm.    R.I. Gen. Laws § 6A-2-313;

nn.    S.C. Code Ann. § 36-2-313;

oo.    S.D. Codified Laws, § 57A-2-313;

pp.    Tenn. Code Ann. § 47-2-313;

qq.    Tex. Bus. & Com. Code § 2.313;

rr.    Utah Code Ann. § 70A-2-313;

ss.    9A V.S.A. § 2-313;

tt.    Va. Code Ann. § 59.1-504.2;

uu.    Wash. Rev. Code Ann. § 6A.2-313;

vv.    W. Va. Code § 46-2-313;

ww.    Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

193.    Within a reasonable time after they knew or should have known, Defendants did not change the Products' label to stop the deceptive acts and practices by falsely warranting that their Products were safe for use and provided "[t]rusted protection for [consumers'] healing wounds," and by falsely omitting that their Products contained material levels of PFAS.

## COUNT V
### Negligent Misrepresentation
### (On Behalf of Plaintiffs and the National Class)

194.   Plaintiffs bring this count on behalf of themselves and the National Class and repeat and re-allege paragraphs 1 through 141 as if fully included herein.

195.   As alleged above, Defendants misrepresented the safety of their Products and omitted that the Products contained PFAS.  These misrepresentations and omissions constituted a material fact (i.e., a consumer's decision to purchase the Products would be influenced by its safety and the presence of PFAS).

196.   Defendants' misrepresentations and omissions were made in the course of business transactions (the marketing, advertisement, sale, and purchase of the Products) in which both Plaintiffs and Defendants have a pecuniary interest.

197.   Defendants knew (or should have known) that these representations and omissions were false and/or misleading and failed to exercise reasonable care in dissemination of the information contained on its labels and in its marketing and advertising.

198.   Defendants possess superior knowledge regarding the risks involved in the production and manufacturing of their Products. Such knowledge is not readily available to consumers like Plaintiffs and Class Members.

199.   Defendants have a duty to provide consumers, like Plaintiffs and Class Members, with products that are safe for their intended use.

200.   Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains unsafe substances, such as PFAS, especially at the point of sale, and therefore must and do rely on Defendants to truthfully and honestly report what the Products contain on the Products' packaging and/or labeling.

201.   Defendants intended that their representations and omissions would induce consumers like Plaintiffs and Class Members into purchasing the Products.

202.   Because of Defendants' misrepresentations, Plaintiffs are now at a heightened risk of having elevated levels of PFAS in their bodies and bloodstreams.

203.   Plaintiffs' injuries were proximately caused by Defendants' misrepresentations and omissions. Plaintiffs viewed Defendants' labels prior to purchasing the Products, and the representations that the Products were safe prompted them to purchase the Products. Had Plaintiffs been aware of Defendants' misrepresentations and omissions, they would have been unwilling to purchase the Products, or to purchase them at the price that they paid.

**COUNT VI**
**Unjust Enrichment**
**(In the Alternative, On Behalf of Plaintiffs and the National Class)**

204.   Plaintiffs bring this count on behalf of themselves and the National Class and repeat and re-allege paragraphs 1 through 141 as if fully included herein.

205.   At all relevant times, Defendants were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products and their packaging. At all relevant times, it was reasonably foreseeable by Defendants that the use of the Products in their intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiffs and the Class as the ultimate users of the Products.

206.   At all relevant times, Defendants knew or had reason to know of the risk of injury and the resultant harm that the Products posed to Plaintiffs and Class Members, as the existence of PFAS in the Products existed at the time of their design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

207.   Defendants, as the designers, manufacturers, testers, distributors, marketers, advertisers, and/or sellers of the Products, had a duty to warn Plaintiffs and the Class of all dangers associated with use of the Products.

208. At minimum, the duty arose for Defendants to warn consumers that use of the Products could result in injury and was unreasonably dangerous.

209. Defendants have been unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiffs and the other members of the Class. Retention of those monies under these circumstances is unjust and inequitable because Defendants' representations regarding the quality or value of the Products were misleading to consumers, which caused injuries to Plaintiffs and the other members of the Class, because they would have not purchased the Products had they known the truth or would only have purchased the Products for a lower price.

210. Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and the other members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the other members of the Class for their unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated members of the Class, pray for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiffs as Class Representative, and appointing Plaintiffs' counsel as Class Counsel;

(b) Directing that Defendants bear the costs of any notice sent to the Class;

(c) Ordering Defendants to pay restitution to Plaintiffs and the Class;

(d) An Order requiring Defendants to establish a blood testing program for Plaintiffs and the Class, as well as to establish a medical monitoring protocol for Plaintiffs and the Class to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to

CLASS ACTION COMPLAINT

1    PFAS;

2    (e) A jury trial and damages according to proof;

3    (f) Awarding actual damages to Plaintiffs and the Class;

4    (g) Awarding Plaintiffs and Members of the Class statutory damages, as

5    provided by the applicable state consumer protection statutes invoked

6    above;

7    (h) Awarding attorneys' fees and litigation costs to Plaintiffs and Members

8    of the Class;

9    (i) Civil penalties, prejudgment interest and punitive damages as permitted

10    by law; and

11    (j) Ordering such other and further relief as the Court deems just and

12    proper.

13    **JURY TRIAL DEMAND**

14    Plaintiffs hereby demand a jury trial of the claims asserted in this Class

15    Action Complaint.

16

17    Dated:  June 27, 2024.                    Respectfully submitted,

18                                              */s/ Kristen Lake Cardoso*
                                                Kristen Lake Cardoso (CA SBN 338762)
19                                              **KOPELOWITZ OSTROW P.A.**
                                                One West Las Olas Blvd., Suite 500
20                                              Fort Lauderdale, Florida 33301
                                                Tel: 954-525-4100
21                                              cardoso@kolawyers.com
                                                ostrow@kolawyers.com
22
                                                Trenton R. Kashima (CA SBN No. 291405)
23                                              **MILBERG COLEMAN BRYSON**
                                                **PHILLIPS GROSSMAN, PLLC**
24                                              402 W. Broadway St., Suite 1760
                                                San Diego, CA 92101
25                                              Tel: (619) 810-7047
                                                tkashima@milberg.com
26

27

28
                                        - 41 -
CLASS ACTION COMPLAINT

Nick Suciu III*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

J. Hunter Bryson*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (919) 539-2708
hbryson@milberg.com

Luis Cardona*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
1311 Ponce de Leon Avenue
San Juan, PR 00907
Tel: (516) 862-0194
lcardona@milberg.com

Counsel for Plaintiff and Proposed Class

*Pro Hac Vice* application forthcoming

- 42 -